KINDORF v. HOELLERER.

(Supreme Court, Appellate Division, First Department.  November 13, 1903.)

1. MASTER AND SERVANT—NEGLIGENCE—PERSONAL INJURIES.

In an action by plaintiff, who was employed by defendant as foreman in his livery stable, and, together with another, attempted to repair an elevator which was out of order, and was injured by the falling of the elevator while he was using it, immediately after having made such repairs, *held*, that the evidence showed no negligence on the part of defendant.

Patterson and Laughlin, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Frederick Kindorf against Phillip J. Hoellerer.  From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals.  Reversed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Frank V. Johnson, for appellant.
William P. Maloney, for respondent.

INGRAHAM, J.  In June, 1899, the plaintiff was employed by the defendant, the proprietor of a stable, as a coach driver.  In the prosecution of his business, the defendant owned and operated an elevator, and the machinery and appurtenances thereto, used for hoisting carriages and wagons from the cellar of his stable to the various upper floors of the building.  On the 3d day of June, 1899, while the plaintiff was absent from the stable, the machinery of this elevator had broke down, and the elevator had fallen.  Peterson was foreman in the stable.  The plaintiff testified that upon his return the defendant was absent, and Peterson told the plaintiff that the elevator was out of order; that defendant had notified the elevator people, but they would not be able to come to fix it until Monday; that the plaintiff then replied to Peterson, "I cannot do nothing;" that Peterson asked the plaintiff if he could fit a key that had fallen out of the machinery in the slot from which it had come, and handed the plaintiff the key.  In reply the plaintiff said, "I cannot do this alone," when Peterson told him to take a man named Bruckner to help, and the plaintiff and Bruckner went up to the roof and hammered in the key.  This key was a piece of steel that fitted in a groove in a shaft and cogwheel, part of the machinery that operated the elevator, to prevent the cogwheel from slipping around the shaft; and it was by turning this cogwheel that the elevator was raised.  After the plaintiff had put this pin in its position, Peterson hoisted the car to the top.  The plaintiff then lowered the cable that raised the counterweights, and which had parted when the elevator fell to the first floor.  He then told Peterson, who seems to have been on the first floor, that it was all right.  Peterson then started the engine, and made the first trip in the elevator.  The plaintiff and Bruckner then came down, and Peterson told plaintiff to "take these rigs up."  The plaintiff made four or five trips in the elevator.  On the last trip he made to the top floor, he took a

84 N.Y.S.—30

carriage off the elevator, and put it back about 30 feet from the elevator shaft, and then came back to the elevator, and started to go down to get another carriage. After the car started to go down, plaintiff left the check which regulated the elevator, and started to walk across the elevator floor towards a window of the elevator shaft, where he could look out in the street, when he found the car was going faster than it should go. He ran to the cable and got hold of it, but it had got such a start that he could not stop or check the car until it landed in the cellar; and his legs were broken, and he was otherwise injured. This elevator was placed in the building about a year before the accident, and at that time the plaintiff was foreman for the defendant. The plaintiff was familiar with this elevator, understood its mechanism, know where the key that had dropped out belonged, and when he went to fix it, he found nothing else out of order. The two cables were in place on the drums, and the cables that raised and lowered the counterweights were all right. Bruckner, the man who assisted the plaintiff in repairing this elevator, testified that after the accident he saw that the cable that raised the counterweights was broken just above the weight.

On behalf of the defendant it was proved without contradiction that this elevator was a new one when it was put in the building; that about 2 o'clock of the day of the accident (June 3, 1899) the defendant was at the stable when the elevator came down with a wagon on it; that he discovered then that the elevator was out of order, and at once called up the manufacturers, and asked them to send and have it repaired; that, when the elevator had fallen, the cable that raised the counterweights had been broken, and the counterweights were detached from the cable. Peterson, who was the foreman, and who was not in the employ of the defendant at the time of the trial, testified to this first accident to the elevator on the day in question. That, when the plaintiff came in, Peterson told the plaintiff that the elevator was broken, to which the plaintiff replied, "I will fix that in a couple of minutes." That Peterson told the plaintiff: "It is the boss' orders no one is to touch that elevator. He sent for the elevator men to fix it." The plaintiff then said: "I can fix it. I have fixed it before many times." Peterson said: "All right. If you fix it, you fix it at your own risk. The boss' orders is for you not to touch that elevator, and for no one, because he sent for the men to fix it." That the plaintiff was not to touch the elevator, but to let it stay where it was in the cellar, and to take the coaches around to the Eleventh street old stable. That, notwithstanding these instructions, the plaintiff went up and drove the pin in, and afterwards adjusted the counterweights, putting two or three knots in the cable, and lashing the two ends of the cable together. That, after the plaintiff and his companion had thus repaired the elevator, they started it, and took two or three trips with it before the accident. Peterson's testimony in relation to his instructions to the plaintiff not to touch the elevator or operate it was corroborated by three witnesses who were present at the time, and heard the orders given to the plaintiff, and who were not in the defendant's employ or interested in the result of the suit. In rebuttal the plaintiff testified that he did not have anything to do with tying

the cable to the counterweights; that, when the car came up after he had put in the pin, he let the cable down, and somebody downstairs attached the counterweights. Bruckner also testified that the plaintiff and he were at the top of the building during the time that the cable was fastened to the counterweights, and that neither he nor the plaintiff had anything to do with fastening the cable to the counterweights.

It is quite clear that the accident was caused by the parting of the cable that raised the counterweights. It is also quite clear that the rope was attached to the counterweights after the first accident by some one, for the elevator made several trips after the repairs were made. The evidence is undisputed that subsequent to the first accident the elevator was put out of use, and that the defendant had given orders to have it repaired by those competent to do work of this kind. Assuming that the question as to who it was that attached the cable to the counterweights was a question for the jury, the liability of the defendant depends upon his responsibility for the method adopted by those who attached the cable to the counterweights. There is no evidence that the work was not properly done, unless it can be inferred from the fact that the cable parted so that the counterweights became detached from the cable after several trips had been made with the elevator. The plaintiff knew that the cable had been detached from the counterweights by the first accident, because after the accident he testified that when the elevator was brought to the top he adjusted the cable over the drum and let it down for the purpose of having the counterweights attached. He knew, therefore, that some one had to do that work. Just what caused the accident is not disclosed. Whether the cable broke, or the knots slipped out, does not appear. We have simply the fact that, after this cable had parted in consequence of the first accident, in some way it was again attached to the counterweights, and that, when plaintiff was subsequently using the elevator, it became detached from the counterweights, and that consequently the elevator fell.

The plaintiff seeks to charge liability upon the defendant by making him responsible for Peterson's act, claiming that the evidence was sufficient to justify the jury in finding that Peterson in some way was negligent in attaching these counterweights to the cable, or in directing him to use the elevator after the repair. But there was no evidence that Peterson had anything to do with attaching the cable to the counterweights. On the contrary, an undertaker, who was one of the defendant's customers, and who was present at the time (he being interested in having the elevator fixed, so that he could get a wagon of his that was in the building for use), testified that he and the plaintiff attached the cable to the counterweights, and he explained the manner in which it was done. The plaintiff denies this, but there is no direct evidence that connects Peterson with the repair of this elevator. The plaintiff knew that the elevator had broken down. He knew that his employer had sent for mechanics to fix it. According to the testimony of several witnesses, he was told that his employer had directed that the elevator should not be used until repaired. Under these circumstan-

ces, he undertook to make the repairs himself. There is no evidence that the method adopted in attaching the cable to the counterweights was not the right method, or that the cable parted from any neglect of either the defendant or Peterson. The defendant had done all that he could do to protect his workmen after the elevator had fallen the first time. He employed the manufacturer of the elevator to make the repairs, and gave instructions that the elevator should not be used until it was repaired. The plaintiff, without instructions of his employer, and, according to the weight of the testimony, after being informed of the directions that had been given not to use the elevator until it was repaired, undertook to repair it; and after he had repaired it he undertook to use it. He knew the condition that existed. He had attempted to repair the elevator. Under these conditions, I think the evidence fails to show any negligence on the part of the defendant or Peterson that would justify a recovery, but that, on the contrary, the plaintiff, in using the elevator, assumed the risk that the repairs to it that he himself had taken part in making were such as to make the elevator safe, and that for the accident that happened the defendant is not responsible. To sustain this verdict, there must be evidence of the defendant's negligence. Assuming that Peterson occupied a position that would make the defendant liable for Peterson's negligence, there is no evidence that Peterson took any part in making the repairs, or that he was responsible for the condition which caused the accident. The defendant did not furnish this elevator in the condition in which it was when the plaintiff used it for the use of his employés. The plaintiff and his coemployés voluntarily assumed to repair the elevator after it became out of order, without the knowledge of the defendant; and, when it had been thus patched up, the plaintiff voluntarily assumed to use it, and for an injury that resulted the defendant is not liable.

It follows that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and HATCH, J., concur. PATTERSON and LAUGHLIN, JJ., dissent.